In the Matter of the Application of the CITY OF NEW YORK Relative to Acquiring Title, etc., to the Lands, Tenements and Hereditaments Required for the Opening and Extending of Inwood Hill Park, in the Borough of Manhattan, City of New York, etc.

CITY OF NEW YORK, Appellant; EMPIRE MORTGAGE COMPANY and Others, Respondents.

First Department, July 6, 1926.

**Municipal corporations — condemnation of land under water in New York city, property of city — city has right to condemn property for park purposes and is entitled to compensation assessable against benefited property — Greater New York Charter, § 71, does not prohibit condemnation of city property for park purposes — Greater New York Charter, § 970, authorizes condemnation.**

The city of New York has the right to condemn, for park purposes, property under water owned by the city, and is entitled to be paid the full value therefor and to have the amount assessed against the benefited property the same as a private individual.

Condemnation of city-owned property for park purposes is not prohibited by section 71 of the Greater New York Charter, which inhibits the alienation of said property, for power is expressly given by section 970 of the Greater New York Charter to condemn city property for such purposes.

MERRELL, J., dissents, with opinion.

APPEAL by the City of New York from that part or portion of the last partial and separate final decree of the Supreme Court, entered in the office of the clerk of the county of New York on the 10th day of January, 1924, pursuant to section 1003 of the Greater New York Charter (Laws of 1901, chap. 466, as added by Laws of 1915, chap. 606),* rendered after a trial at the New York Special Term in condemnation proceedings, which eliminates from the proceeding the land under water situate between the mean high-water mark and the United States bulkhead line of the Hudson river owned by the city of New York, and known as damage parcels Nos. 42 and 43, and also from said decree in so far as it contains no awards for the aforesaid land under water, and in so far as the court failed to make any award for the acquisition of title to the aforesaid land under water, and in so far as said decree relates to and affects the aforesaid land under water.

*L. Howell LaMotte* of counsel [*Joel J. Squier* with him on the brief; *George P. Nicholson, Corporation Counsel*], for the appellant.

* Since amd. by Laws of 1925, chap. 635.— [REP.

*Martin Conboy* of counsel [*Harry B. Chambers* and *Philip S. Hill* with him on the brief; *Griggs, Baldwin & Baldwin,* attorneys], for the respondents Frank M. Van Wagonen and others.

*Franklin Grady* of counsel [*H. deF. Baldwin* with him on the brief; *Lord, Day & Lord,* attorneys], for the respondent Empire Mortgage Company.

Martin, J.   In 1916 the board of estimate and apportionment pursuant to the Greater New York Charter, decided it was for the public interest that the title to certain real property be acquired for the opening and extending of Inwood Hill Park, in the city of New York, as laid out on the city map in accordance with a resolution which had been previously adopted by the said board and approved by the mayor.   The property to be acquired for such public purposes was fully described therein.   It included lands under water owned by the city of New York, known herein as damage parcels Nos. 42 and 43, which are the subject of this controversy.

A question has arisen whether the municipality may condemn for park purposes property under water between the mean high-water line and the Federal bulkhead line of the Hudson river and whether the value of same, as fixed in the condemnation proceeding, may be made part of the total amount to be assessed on adjoining property in the boroughs of Manhattan and The Bronx in accordance with the resolution of the board of estimate providing for the apportionment of the assessment.   That resolution provided that five per cent should be assessed upon a certain primary area of benefit; forty-five per cent on a second area of benefit; forty-five per cent upon the borough of Manhattan, and five per cent upon the borough of The Bronx.

In accordance with the resolutions referred to and others adopted at the same time and subsequently, the corporation counsel instituted the necessary proceedings and the matter progressed in the Supreme Court and a further resolution vesting title was adopted by the board of estimate and apportionment in 1917.

It appears that the court first allowed the city of New York $251,707.26 for damage parcel No. 42 and allowed $8,054.20 for damage parcel No. 43.   For damage parcel No. 42, the land under the Hudson river between the high-water line and the United States bulkhead line, the court allowed at the rate of $1,100 per city lot, and for parcel No. 43, the land under the Harlem river ship canal between the high-water line and the United States bulkhead line, the court allowed at the rate of $250 per city lot.

Subsequently, however, the awards to the city were eliminated and assessments were reduced accordingly, objections having been

filed in due course by various owners of property assessed. The objectors contended that there was no authority in law for taking city property for park purposes; and that, in no event, should awards be made to the municipality for the property as it had been ceded to the city subject to certain conditions, it being asserted that it could not be sold or taken for any purpose. However, its value for park uses is as great as if the city could sell it and give an absolute fee.

It was also urged by some of those opposing the assessment that the awards for said lands under water were made by this court without an opportunity to be heard as to the value thereof.

Although the city contended that these objections were unfounded, nevertheless, it recalled the only witness who testified for it as to values and consented that any one aggrieved might cross-examine him, and also consented that those assessed be given an opportunity to produce evidence as to values. The owners failed to avail themselves of these opportunities.

The court, however, sustained their objections upon the ground that the city had no authority to acquire, in this or any other proceeding, for park purposes, the land under water.

There appears to be no doubt but that the city of New York may take its property for public purposes, receive compensation therefor and have the same assessed against the property benefited. (*Matter of Mayor of New York — Fordham Road,* 74 App. Div. 343; appeal dismissed, 172 N. Y. 653; *Matter of Ninth Avenue & 15th Street,* 45 id. 729, 733.)

The city of New York contends that as a proprietor and owner of land it is to be paid for the land the same as any other proprietor. (*Matter of Ninth Avenue & 15th Street, supra.*)

The property could be sold to individuals subject to the limitations in the grant to the city and subject to the charter provisions.

In *Langdon* v. *Mayor* (93 N. Y. 129, 134) the court said:

" Under the Dongan Charter,* in 1686, the crown of England granted to the City of New York all the land between high and low-water mark around the island of Manhattan, with jurisdiction over the same, and with power ' to take in, fill, and make up and lay out all and singular the lands and grounds in and about said city and island Manhattan, and the same to build upon, or make use of in any other manner or way as to them shall seem fit, as far into the rivers thereof and that encompass the same as low-water mark aforesaid; ' and in 1730, by the Montgomerie charter,† it further granted a strip of land four hundred feet in width, lying immediately

---

* See §§ 4, 14.— [REP.        † See §§ 37, 38.— [REP.

First Department, July, 1926.  [Vol. 217

outside of low-water mark, and extending from Corlear's Hook, on the East River, around the southern extremity of the island to Bestaver's rivulet (excepting, however, the space in front of the Battery), with full power and authority at any time thereafter ' to fill, make up, wharf, and lay out all and every part thereof,' and to take the wharfage, cranage and dockage arising or accruing therefrom. It was, however, provided in the grant that nothing therein contained should empower or entitle the City to wharf out before any persons who had prior wharf grants beyond low-water mark, without the actual agreement or consent of such persons, and that of the wharves to be built or run out by the city, there should be left toward the East and North rivers, forty feet broad for the convenience of trade and the planting of batteries in case of necessity.

" Under these charters, the city at an early day made many grants, to private persons, of lands under water, with the right to make wharves and take the wharfage accruing therefrom, and such grants extended out into the rivers to unequal distances within the limits of ownership by the city. * * *

" We think it equally clear that whatever title and property rights the city thus obtained, it could transfer and convey to individuals. * * *

" From the earliest times in England the law has vested the title to, and the control over, the navigable waters therein, in the crown and Parliament. A distinction was taken between the mere ownership of the soil under water and the control over it for public purposes. The ownership of the soil, analogous to the ownership of dry land, was regarded as *jus privatum*, and was vested in the crown. But the right to use and control both the land and water was deemed a *jus publicum*, and was vested in Parliament. The crown could convey the soil under water so as to give private rights therein, but the dominion and control over the waters, in the interest of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by Parliament. * * *

" So in this country each State (subject to limitations to be found in the Federal Constitution) has the absolute control of all the navigable waters within its limits. As said by the chancellor in *Lansing* v. *Smith* (4 Wend. 9), the State through its Legislature ' may exercise the same powers which previous to the Revolution could have been exercised by the King alone, or by him in conjunction with Parliament, subject only to those restrictions which have been imposed by the Constitution of the State and the United States.' "

The city has an absolute right to improve its water front property or to use it for any public purpose.

The State had title and power to dispose of these lands and it could permit the city to do likewise.

In *People* v. *Steeplechase Park Co.* (218 N. Y. 459, 473) the court said: " In this country the State has succeeded to all the rights of both crown and Parliament in the navigable waters and the soil under them, and here the *jus privatum* and the *jus publicum* are both vested in the State."

In *Towle* v. *Remsen* (70 N. Y. 303, 308) the court said: " The land under water originally belonged to the crown of Great Britain, and passed by the Revolution to the State of New York. The portion between high and low-water mark, known as the *tideway*, was granted to the City by the early charters (Dongan Charter, §§ 3 and 14; Montgomerie Charter, § 37), and the corporation have an absolute fee in the same."

In *Knickerbocker Ice Co.* v. *Shultz* (116 N. Y. 382, 387) the court said: " Through the medium of the Legislature, the State may exercise all the powers which previous to the Revolution could have been exercised either by the King alone or by him in conjunction with his Parliament, subject only to those restrictions which have been imposed by the Constitution of this State or of the United States."

In *Matter of Long Sault Development Co.* (212 N. Y. 1, 8) the court said: " The power of the Legislature to grant land under navigable waters to private persons or corporations for beneficial enjoyment has been exercised too long and has been affirmed by this court too often to be open to serious question at this late day. (*Lansing* v. *Smith*, 4 Wend. 9.) "

Grants by the State to the owners of the adjoining upland for beneficial enjoyment or commercial purposes have long been authorized and recognized as lawful.

In *Matter of City of New York — Speedway* (168 N. Y. 134, 141) the court said: " The City of New York, as successor to the rights of the crown, has ' the absolute power to improve the water front for the benefit of navigation, free from any interference by the riparian owner, whose sole right as against the State or its municipal grantee, as trustee for the public, is the preemptive right to purchase, in case of a sale, when conferred by statute.' "

In *Matter of Commissioner of Public Works — Harlem River* (135 App. Div. 561, 579) the court said: " I have reached the conclusion that while the title to the land under water, which was vested in the city by the act of 1852, was not divested by the act of 1868,* that, being upon a navigable stream, it was held for the

---

* See Laws of 1852, chap. 285; Laws of 1868, chap. 150.— [REP.

same public trusts that it had been held prior to the act of 1852 by the State in the public interests. The nature of this title, both in the State and as conferred by it upon the city, is set forth in *Matter of City of New York* (168 N. Y. 134), the *Speedway* case, with a full citation of authorities. When the State authorized the proprietors of the water grants, in the interests of navigation and commerce, to erect piers and dig out slips, and when the city, by its dock department, granted its permission, and when, acting under such authority and permission, Ingraham built the pier and dug out the slip, expending his money therefor, I think he acquired property rights which could not be taken from him without due compensation. Whether this permit from the dock department should be considered a revocable license because of the provision therein contained, ' subject to any alterations which the Department of Docks may by law be empowered to make in said district,' or not, it seems sufficient to say that the department of docks has made no such alteration in said district, and has not revoked said license by any act done by it.

" This property is being taken by authority of law for an entirely different purpose, to wit, for the foundations and bridge across the river, and is in no sense an aid to the navigation thereof, but an obstacle thereto, even if it be a drawbridge, and the law which authorized it and the petition which instituted the proceedings provided for the acquiring of title to the lands and premises, rights and easements required.

" A valuable right which has been in existence since the year 1871 is being destroyed for the purpose of a public improvement. Mere easements of the light, air and access in the public streets have been held in innumerable cases in this State to be property rights and for the destruction thereof the courts have compelled the payment of vast sums of money."

The State may delegate the power to take such land to its agent, the municipality. It has delegated such power to the city of New York, and the city is authorized, in our opinion, to take these lands for park purposes. (Greater N. Y. Charter, § 970, as added by Laws of 1915, chap. 606; since amd. by Laws of 1917, chap. 631, and Laws of 1922, chap. 563; *Matter of Mayor of New York — Fordham Road, supra; Matter of Mayor — Van Cortlandt Avenue*, 186 N. Y. 237.)

In *Matter of Mayor of New York — Fordham Road (supra)* the city condemned wharf property extending into the Harlem river between high-water mark and the bulkhead line, as established by the United States government in 1890. It was there held that the municipality had a right to acquire the property for street purposes. In fixing

value it was said that the commissioners were to take into consideration the location and the improvements, as well as present and prospective earning capacity, in view of the uses to which the property might be put.    The city had the same title there that it has to the lands under water taken in this proceeding.    Its lands under the waters surrounding Manhattan Island within the United States bulkhead line, subject to the riparian rights of upland owners, have a substantial value.    (*Sage* v. *Mayor*, 154 N. Y. 61; *Matter of City of New York*, 217 id. 1.)

In no case should an award be made for less than the value of the property actually taken by condemnation.    (*Matter of City of New York*, 190 N. Y. 350; 168 id. 134.)    The city is entitled to compensation for its loss and damage in like manner as other owners.    (Greater New York Charter, § 978, as added by Laws of 1915, chap. 606; *Matter of Ninth Avenue & 15th Street, supra; Matter of Mayor — Van Cortlandt Avenue, supra.*)    Otherwise the property of the People surrounding this park will be enhanced in value at the expense of the rest of the taxpayers of the city of New York, and without just compensation being granted to the city.    (See U. S. Const. 14th Amendt. § 1; State Const. art. 1, § 6.)

Although section 71 of the Greater New York Charter (Laws of 1901, chap. 466) provides against the city's selling certain property, it does not prevent the condemnation of property when needed for a public use.    This is not a disposition inhibited by the statute; for power is expressly given to condemn property for such a use. (Greater N. Y. Charter, § 970; *Matter of Ninth Avenue & 15th Street, supra.*)

The purpose of said section 71 is to render waterfront and wharf property, ferries, land under water, public landings, wharves, docks, streets, avenues, parks and all other public places inalienable.    If it prevented the condemnation of property, all such properties would be beyond the reach of the public authorities however necessary it might be to devote them to public uses.    The statute was never intended to have this effect.    The city has frequently condemned such property.

When this statute was invoked in the recent case of *City of New York* v. *D., L. & W. R. R. Co.* (206 App. Div. 228), it was here said: " The appellant attacks the agreement of December 4, 1903, between the city of New York and Carroll, defendant's predecessor in title, upon the ground that it is *ultra vires* and in contravention of the provisions of section 71 of the Greater New York Charter.    Section 71 reads as follows: ' The rights of the city in and to its water front, ferries, wharf property, land under water, public landings, wharves, docks, streets, avenues, parks, and all

other public places are hereby declared to be inalienable.' (Laws of 1901, chap. 466, § 71.) I do not think the agreement between the city and Carroll contravenes the charter provision above quoted, when read in connection with other charter provisions hereinafter mentioned. I am of the opinion that the agreement of December 4, 1903, was in all respects valid and binding upon the parties."

In the same case the Court of Appeals (237 N. Y. 398), in passing on section 71 of the charter, said: " The statute invoked in support of this conclusion is section 71 of the charter of the city of New York  *  *  *. We have no thought to whittle down by artificial or nice construction this comprehensive declaration. On the other hand, in giving effect to it, we are not at liberty to disregard exceptions, if any, established by other sections of the charter, which equally with this one are to be respected and obeyed."

Assuming that it has a right to condemn the property, the city should receive compensation therefor. It might be leased, for example, to be used for dock purposes, and a large revenue result. This possible source of revenue is lost when the land is used exclusively in connection with a park. It might be utilized for many purposes if not taken for a park. Its value should not be, in part at least, transferred to the surrounding property without compensating the city.

To the suggestion that the park would have the same outlook and rights over the water front if the city's property had not been taken, the answer is that, if it were not taken for park purposes, the municipality might lease for dock or other purposes or otherwise dispose of it subject to the limitations of the grant of same from the State or charter provisions, which charter provisions may at any time be repealed.

We are, therefore, of the opinion that the final decree should be modified by reinstating the awards of the city, and as so modified affirmed, with costs to the appellant.

CLARKE, P. J., FINCH and BURR, JJ., concur; MERRELL, J., dissents.

MERRELL, J. (dissenting). The city of New York has appealed from so much of the last partial and separate final decree of the court at Special Term as eliminated from the proceeding to condemn real property for the purpose of creating Inwood Hill Park, certain lands under water between the mean high-water line and the United States bulkhead line of the Hudson river granted to the city of New York by the Dongan and Montgomerie charters and by the State of New York by various legislative enactments.

The lands under water in question which the Special Term, in the last partial and separate final decree appealed from, hold could not be taken by the city of New York, and that the city could not receive compensation therefor and assess such compensation upon various neighboring properties benefited thereby, were known as damage parcels Nos. 42 and 43. Two main questions are presented upon this appeal: *First*, as to whether or not the lands under water represented by said damage parcels can be taken by the city in condemnation proceedings; and, *secondly*, whether the city is entitled to damages by reason of such taking.

By resolution of the board of estimate and apportionment, adopted March 17, 1916, certain lands, including said lands under water, were taken and laid out on the city map as a public park, known as Inwood Hill Park. The resolution of the board of estimate was approved by the mayor, and by a further resolution of the board of estimate and apportionment adopted pursuant to the provisions of the Greater New York Charter, as amended, it was resolved that the said real property required to form said Inwood Hill Park should be taken by condemnation proceedings, and by resolution duly adopted, the board of estimate and apportionment requested the corporation counsel of the city of New York to apply to a Special Term of the Supreme Court to have the compensation to which the owners of the property taken were justly entitled ascertained and determined by said court without a jury, and that the court should assess the costs and expenses of the proceeding, and to take whatever proceedings were required to acquire title in the name of the city of New York for the use of the public for the purpose of opening and extending said Inwood Hill Park in the borough of Manhattan, New York city. By resolution adopted at the same time the board of estimate and apportionment directed that five per cent of the entire cost and expenses of the proceeding should be laid upon a primary area benefit therein described and forty-five per cent upon a secondary area benefit; that forty-five per cent of the expense and cost be laid upon the borough of Manhattan, and the balance of five per cent on the borough of The Bronx. Pursuant to said resolution the city applied to the Supreme Court to have the compensation which should be made to the respective owners of the real property acquired ascertained and determined, and to have the cost and expense of the proceedings assessed upon the property within the area of benefit in accordance with the resolution of the board of estimate and apportionment. On November 21, 1916, the city's application was granted by an order of the Special Term. Thereupon the board of estimate and apportionment on November 23,

1917, adopted a resolution to the effect that the property within the lines of Inwood Hill Park, including the damage parcels in question, vested in the city of New York. There were, however, excepted two small damage parcels, Nos. 24 and 25, which the State at that time had taken as a part of the Barge canal system, but which later were relinquished by the State, and damages assessed with reference thereto. When the proceeding came on for trial the learned justice presiding at Special Term awarded the city of New York for the land under water, known as damage parcel No. 42, $251,707.26, and for the land under water known as parcel damage No. 43, $8,054.20. Thereupon, by resolution of the board of estimate and apportionment, the Supreme Court, pursuant to section 1003 of the Greater New York Charter, as amended,* was authorized to file a tentative decree as to the damages embracing certain of the parcels of uplands taken in the proceeding and a first partial and tentative decree as to said certain parcels of land was filed in the office of the clerk of New York county on May 10, 1920. A hearing was had thereon, objections being made to said decree, and the court made and signed a first partial and separate final decree and the same was duly filed in the office of the clerk of New York county on June 22, 1920. Subsequently on November 19, 1920, the board of estimate and apportionment authorized the Supreme Court to file a tentative decree as to damages with reference to all the remaining uplands, except such as were owned by the city of New York, and pursuant to such resolution the Supreme Court made a second partial and separate tentative decree with reference thereto. This decree, after objections thereto were heard, was signed by the court and filed in the office of the clerk of New York county. The said two partial and separate final decrees covered all of the property taken in the proceeding, except that owned by the city of New York, damage parcels Nos. 42 and 43, land under water, and involved in the appeal herein, and certain other small damage parcels. On June 26, 1923, the court made and filed a last partial and separate tentative decree embracing the two damage parcels Nos. 42 and 43, which decree was filed in the office of the clerk of New York county on July 31, 1923, and notice of the filing of the same was duly published in the *City Record.* Objections were made to said last partial separate tentative decree by various owners of the property assessed in the proceeding. It was the contention of these objectors that the sums assessed on their property as benefit included improperly the awards made by the decree to the city

---

* See Laws of 1901, chap. 466, § 1003, as added by Laws of 1915, chap. 606; since amd. by Laws of 1925, chap. 635.— [REP.

of New York for its lands under water between mean high-water line and the United States bulkhead line. It was the contention of the objectors that there was no authority in law for the taking of such lands in the condemnation proceeding for park purposes, and that, even if taken, the city should not have been awarded any damages by reason thereof, it then being itself the owner of the land under water, subject to the right of the people of the State to use the same for navigation purposes. Said objections coming on to be heard, the court sustained the same and held that the city had no authority to acquire in this proceeding for park purposes lands under water which the city held between mean high-water line and the United States bulkhead line of the Hudson river; and in the last partial and separate final decree, appealed from herein, the court eliminated from the proceeding the said land embraced in said damage parcels Nos. 42 and 43, and struck out the awards which it had made for said land and which altogether amounted to $259,761.46. The city appeals from such part of the last partial and separate final decree as eliminated from the proceedings the said lands covered by damage parcels Nos. 42 and 43. I am of the opinion that the court, in its last partial and separate final decree, was entirely correct in eliminating from the decree the parcels in question and in denying the city any damages by reason of the taking of the same.

The lands under water embraced in said damage parcels in question are held by the city under grants contained in the Dongan and Montgomerie charters and by various legislative enactments whereby the city was given a proprietary ownership in lands under water about the city of New York, subject, however, to the right of the people of the State to use said lands for navigation purposes. Excepting in certain instances where specific grants have been made by the Legislature to the city, the Legislature has refused to take away from the people the use of the water front about the city for purposes of commerce. The city relies upon the provisions of section 970 of the Greater New York Charter for authority to have awarded to it in this proceeding compensation for the taking by it of the lands under water for park purposes. Section 970 of the Greater New York Charter provides as follows:

" § 970. The city of New York may acquire title either in fee or to an easement, as may be determined by the board of estimate and apportionment, for the use of the public, to all or any of the real property required for streets, [and court-yards abutting streets, and for] parks, parkways, playgrounds, approaches to bridges and tunnels and sites or lands above or under water for bridges and tunnels, and sites or lands above or under water,

for all improvements of the navigation of waters within or separating portions of the city of New York, *or* for the improvement of the water fronts of the city of New York, or part or parts thereof, heretofore duly laid out upon the map or plan of the city of New York, of the city of Brooklyn, or Long Island City, or of any of the territory consolidated with the corporation heretofore known as the mayor, aldermen and commonalty of the city of New York, or hereafter duly laid out upon the map or plan of the city of New York, as herein constituted, and cause the same to be opened, or acquire title as above stated to such interests in real property as will promote public utility, comfort, health, enjoyment, or adornment, the acquisition of which is not elsewhere provided for." (See Laws of 1901, chap. 466, § 970, as added by Laws of 1915, chap. 606; since amd. by Laws of 1917, chap. 631, and Laws of 1922, chap. 563.) The words within brackets were added to the section after the proceedings herein were instituted, and the phraseology was altered in 1922 by omitting the word in italics and by changing the punctuation.

It will be noted that under the section quoted the city of New York is only given authority to acquire certain lands under water for the purposes of bridges and tunnels, neither of which is involved in the present proceeding to take for park purposes.

I am unable to see how the city, which now owns the land under water, subject to the public easement therein, can have any right to take from itself and transfer to itself the said lands for other public uses. The city is the trustee of the lands under water for the benefit of the public. It holds said lands and may, as required, improve the same in aid of commerce and navigation. None of these purposes are infringed in any way by including said lands within the boundaries of the park. They may not, however, be filled in or used in any way destructive of the public rights therein. The city loses nothing because the land under water is included within the boundaries of the park as laid out on the city map, and the property owners gain absolutely nothing thereby, and should not be assessed by reason thereof. The fact that the lands under water may not presently be required for the purposes of navigation is no assurance that they may not hereafter be needed for such purposes. The sole purpose of the granting to the city by the Legislature of the lands in question was so that the city might improve navigation facilities when required. So far as this proceeding attempted to take for the city the land under water for park purposes, which land the city already owned, it takes nothing from the city, and it confers no rights or benefits upon the property owners sought to be assessed therefor.

The appellant claims, *first*, that the objectors have no standing in court, and that they have waived their right to raise the question as to the authority of the city to take the lands under water. Under the practice the owners of the various neighboring parcels of property to be assessed for such improvement could not be and were not properly made parties to the proceeding.   They are over 16,000 in number, and the first opportunity they had to be heard was upon the coming in of the final last partial and separate final decree.   They were not parties to the proceeding and were not bound thereby.   As soon as it was determined to include in the property taken the lands under water and to compensate the city in $259,000 and over therefor and to assess the same upon the adjacent property owners, they came forward and objected, as they had a right to do.   That the objectors have a right to appear in opposition to the granting of the final decree seems to have been clearly held in *Matter of City of New York (Crescent St.)* (217 N. Y. 294).   It seems absurd to say that if the city is taking property which it has no right to acquire, or any more than nominal damages are awarded for taking of land which the city already owns, the persons ultimately affected by such action should not have a right to be heard.   In the order of condemnation, which the city urges is conclusive upon the objectors, the lands in question are not included, as the application for the order expressly excluded therefrom lands already acquired by the city.

It seems to me that the whole question comes down to the proposition that the lands in question sought to be taken are by the city inalienable.   If the city cannot sell or dispose of said lands, how can the city, through the institution of this proceeding, work such alienation?   It was held in *Sage* v. *Mayor* (154 N. Y. 61, 80) that " The purpose for which the supreme authority holds the title to lands under tidewater is inconsistent with the power to grant any easement or right to those lands that will prevent it, when the necessities of commerce demand, from ' wharfing out ' to deep water, so that vessels can load and unload and the interests of navigation be promoted.   *   *   *   The permanent control of navigable waters, if alienable at all, should only be so by an instrument showing a clear and undoubted intention to that end, and in the absence of express language the strict construction required by law in favor of the sovereign, as trustee, limits the effect of the grant by reserving or excepting therefrom the right to fill in the land out to deep water and build wharves thereon in aid of navigation and as an indispensable incident to commerce."

In *Knickerbocker Ice Co.* v. *42nd St. R. R. Co.* (176 N. Y. 408) the Court of Appeals said (at p. 417):  " The title of the city of

New York in the tideway and the submerged lands of the Hudson river granted under the Dongan and Montgomerie charters and the acts of the Legislatures of 1807, 1826 and 1837,* was not absolute and unqualified, but was and is held subject to the right of the public to the use of the river as a water highway. * * * The city holds the title which it never had the right to alienate." Furthermore, the Legislature has expressly provided in section 71 of the Greater New York Charter (Laws of 1897, chap. 378; Laws of 1901, chap. 466) that " The rights of the city in and to its water front, ferries, wharf property, *land under water*, public landings, wharves, docks, streets, avenues, parks, and all other public places are hereby declared to be inalienable." (Italics are the writer's.) In other words, the rights of the city to land under water are inalienable so far as the uses and purposes for which they are given to the city are concerned. In *Ackerman* v. *True* (175 N. Y. 353) the Court of Appeals, considering section 71 of the Greater New York Charter above quoted, held that a permit issued by the commissioners of parks having jurisdiction over Riverside Drive was insufficient to justify an encroachment upon the drive by a building. In that connection the Court of Appeals, by Judge MARTIN, said (at p. 364): " Any such construction of that statute would result in practically annulling that portion of the charter of Greater New York which provides that streets and other public places in the city shall be inalienable. (§ 71.) Although it is true that the title of the streets in the city of New York is in the municipality, that title is held by it in trust for public use, and not even the municipal assembly has authority to permit permanent encroachments thereon."

In *Matter of City of New York* (168 N. Y. 134) Judge WERNER wrote (at p. 145): " In *Bedlow* v. *N. Y. Floating Dry Dock Co.* (112 N. Y. 273) the late Chief Judge RUGER in referring to the scope and effect of the Dongan and Montgomerie grants said: ' These grants were obviously made to extend municipal control over said lands and enable the city to regulate the erection of necessary structures upon the land under water around the island, with a view of promoting facilities for the growing commerce and trade of the port of New York, and to regulate and preserve the rights of riparian owners in such lands and the navigable waters covering them. * * * It has been sometimes said that the ownership of the fee in such lands gave the city, as matter of legal right, authority to erect and build such structures thereon as they

---

* See Laws of 1807, chap. 115; Laws of 1826, chap. 58; Laws of 1837, chap. 182.— [REP.

saw fit to make.   We are inclined to think that this proposition to its full extent cannot be maintained.   The right of control over the navigable waters of the State is a legislative power and cannot be destroyed by any authority whatever.   The right of the people to use the natural public highways of the State is *jus publica* and cannot be taken away or seriously impaired.' "

With reference to Fort Washington Park and to the Riverside Park, the Legislature has been careful to prevent the creation of easements which might interfere with the use of the waterfront for the purposes of commerce. and, in granting lands to said parks, the lands now owned by the city are expressly excepted.   (See Laws of 1894, chap. 581, § 2; Laws of 1896, chap. 727, § 2.)   It is very plain therefrom that the Legislature recognized that the city was merely a trustee for the benefit of the people of the lands under water lying around the city of New York between mean high-water mark and the government bulkhead line.   In Dillon on Municipal Corporations (5th ed. § 265) it is said: " The *State holds title* to the lands under navigable waters within its limits   *   *   *. But it is a title different in character from that which the State holds in lands intended for sale.   *   *   *   It is a *title held in trust for the people of the State,* that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing in them freed from the obstructions or interference of private parties.   The State cannot abdicate general control in trust for the public which is thus vested in it in submerged lands and in navigable waters.   Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public.   The trust devolves upon the State for the public, can only be discharged by the management and control of property in which the public has an interest, and cannot be relinquished by a transfer of the property in its entirety."   I am, therefore, of the opinion that the Special Term was right in holding that the city had no authority to appropriate the lands in question for park purposes.

Even if it had a right to take the lands in question, the city suffered no damage whatever by putting these lands upon its map of Inwood Hill Park and designating said lands as a part of the park.   If in so doing the rights of the public are infringed upon, and they may not thereafter be used for the purposes of navigation and commerce, then, clearly, such action is prohibited and in violation of the trust under which the city holds said lands.   If the taking of the park does not interfere with the use of said lands as a part of the water highway about the city, then no damage whatever has resulted to the city and no benefit has accrued to the lands

sought to be assessed therefor. Merely calling the lands under water a part of the park will result in no benefit to any one, and the city should not be permitted to assess damages by reason thereof upon adjacent properties.

I think the decree appealed from should be affirmed, with costs against the city of New York.

Final decree modified by reinstating the awards of the city, and as so modified affirmed, with costs to the appellant. Settle order on notice.